1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LARRY A. CHATMAN,                           No. 2:10-CV-00264 KJM CKD P

12                   Petitioner,

13          v.                                    ORDER AND FINDINGS AND
                                                  RECOMMENDATIONS
14   RICK HILL,

15                   Respondent.[1]

16

17          Petitioner is a California state inmate proceeding through counsel with a federal habeas

18   corpus petition filed pursuant to 28 U.S.C. § 2254 challenging his 2005 convictions for attempted

19   premeditated murder, assault with a deadly weapon, and mayhem.   Petitioner filed a second

20   amended § 2254 petition on July 14, 2015, and respondent filed an answer on October 5, 2016

21   after years of litigation concerning the timeliness of petitioner's claims for relief in his original as

22   well as amended federal habeas petitions.  Petitioner's traverse was filed on February 3, 2017,

23   rendering this case fully briefed.  For the reasons discussed below, the undersigned recommends

24   granting petitioner habeas corpus relief based on trial counsel's failure to investigate and present

25   evidence of petitioner's mental health history to negate the intent required for attempted first-

26

27   _____
     [1] Rick Hill, the Acting Warden of Folsom State Prison, is hereby substituted as respondent in this
28   matter on the court's own motion pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

                                                  1

degree murder.[2]

## I.    Factual History

In ruling on petitioner's direct appeal of his conviction and sentence, the California Court of Appeal, First Appellate District, summarized the facts as follows:[3]

> Chatman and Gregory Everetts are cousins by marriage and have known each other for around forty years. On the afternoon of December 25, 2003, Chatman, his girlfriend, Betty Owens, and their son were among the guests who celebrated Christmas at Everetts's new home in Suisun City. Shortly after Chatman arrived at the house, he and Everetts went to the store to buy some pasta and a lottery ticket. After they returned, the two men went to the garage where they talked and drank brandy.
>
> Everetts testified at trial that his conversation with Chatman was friendly at first but then turned ugly. According to Everetts, Chatman complained that Everetts was bragging about having a new house. Everetts tried to assure Chatman that he could have a home, too, but Chatman became angry and started to taunt Everetts, who is 'illegitimate,' with rumors about the identity of Everetts's father. Both men became angry and raised their voices. At one point, Everetts knocked a hat off Chatman's head, pushed him and told him to go home. Then Everetts went back inside his house.
>
> Everetts testified that, when he saw people in his home having a good time together he did not want to ruin the day by calling the police or making people go home. So he decided to leave for a while, got his car keys and returned to the garage. Chatman was standing with his 'chest out mad' just inside the garage near Everetts's car, which was parked in the driveway. As Everetts walked toward his car, he came within a few feet of Chatman and said, 'Why don't you just be cool, man, you know, and go on.' Chatman planted his back foot and swung a pair of pruning sheers up, over and down toward Everetts's neck. Everetts brought his hands up to his neck and the shears struck his right hand. Chatman grabbed Everetts's legs to flip him over. Everetts came down on top of Chatman who poked Everetts in the armpit with the shears. The men spilled out into the street and continued to struggle for a few minutes until people came from inside the house. Everetts testified that, as a result of the altercation with Chatman, he lost his right pinkie finger, part of his right ring finger was severed but later reattached, and an artery in his wrist was severed necessitating surgery.
>
> During his trial testimony, Everetts maintained that all he had to drink on the Christmas day of his altercation with Chatman

---

[2] In light of this recommendation, the undersigned finds it unnecessary to address petitioner's remaining three claims in his second amended § 2254 petition.

[3] These factual findings are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1).

2

was one sip of an eggnog and brandy drink he had fixed for himself in the garage and that on Christmas Eve he drank only one 40 ounce bottle of beer. Everetts admitted to the jury that he had previously been convicted of petty theft and had a misdemeanor case pending against him when he testified in this case.

Everetts's wife Gloria testified that, on the afternoon of the incident, her husband and Chatman were out in the garage for about 20-30 minutes before any problems arose. Then, she heard yelling and arguing in the garage and went to investigate. Gloria said that she and the other guests found Everetts standing in the middle of the street covered in blood and 'bleeding to death.' Chatman was lying on the ground and the sheers were beside him in the street.[4] Gloria then ran to call the police and an ambulance. Gloria testified that, after the police arrived, Chatman called and she was so upset that she just handed the phone to one of the officers. Gloria admitted to the jury that she had prior convictions for selling or transporting a controlled substance, prostitution and making a false statement to the police.

Officers from the Napa Police Department who arrived at the Everetts's house shortly after the altercation, found a watch, a set of keys and a man's hat in the middle of the street outside the Everetts's home. They did not find a set of pruning sheers and were unable to locate Everetts's severed pinkie finger. Officer Jeffrey Hansen testified that, while he was at the Everetts's house, Gloria handed him a telephone and said that Chatman was on the line. The person on the phone was screaming and yelling and making incoherent statements. At one point the person said, with some profanity thrown in: 'I am gonna come back over there and shoot you and kill you.'

Chatman did not testify at trial but called several witnesses including Everetts's niece, Nicole Hawkins, who had attended the holiday gathering. Hawkins testified that she could hear Everetts and Chatman in the garage arguing from the kitchen where she and other guests were playing cards. During the course of the argument, Everetts went back and forth between the garage and house. At one point when Everetts came into the kitchen, Hawkins expressed a desire to go home. Everetts had promised to give her a ride and Hawkins was concerned because Everetts was intoxicated. She told him that he better stop drinking because she did not want to drive with him while he was in that condition. Everetts continued to go back and forth from garage to kitchen and became increasingly more agitated and argumentative with people in the house. When the argument between the men grew louder, Hawkins went outside and saw Everetts and Chatman fighting in the street.

Betty Owens, Chatman's girlfriend, testified that Everetts was intoxicated when she and Chatman arrived at the holiday

---

[4] However, Gloria later admitted that, after the police arrived, she told them that she did not know what instrument had caused her husband's injuries. The day after the fight, Gloria contacted the police and reported she had found a pair of bloody pruning sheers.

gathering. According to Owens, while the men were in the garage, Chatman came into the house at least three times to fix himself another drink. Owens testified that, when Hawkins asked for a ride home, Everetts became angry because he did not want to go out and stormed out of the house. He returned a short time later and made some 'ugly accusations' about Owens and told her that she better 'check [her] husband.'

According to Owens, when the guests inside the house heard the argument in the garage, Gloria Everetts went to take a look. Gloria then told Owens to leave with Chatman because Everetts was becoming so loud that the neighbors would call the police. Owens and her son went outside to their car and found that Chatman had gone down the street. She called him back so they could leave. As they were attempting to get in the car, Everetts attacked Chatman causing him serious injuries. Owens testified that the altercation left both men covered in blood. During her trial testimony, Owens admitted she had two prior petty theft convictions.

During her closing argument to the jury, defense counsel argued that there was a reasonable doubt as to whether Chatman was guilty of the charged offenses because the evidence showed that he acted in self-defense. Counsel attacked the credibility of both Everetts and his wife and highlighted testimony she characterized as untruthful. She relied on evidence that Everetts was significantly larger than Chatman and that he was intoxicated and agitated throughout the holiday event. She pointed out that Betty Owens's version of the events was consistent with testimony reluctantly given by Everetts's own niece and was also consistent with physical evidence including the fact that personal items were found in the street, where Owens testified that Chatman was attacked, rather than in the garage, where Everetts testified the fight had occurred. Defense counsel also suggested that the cuts on Everetts's hand were consistent with a finding that his injuries were sustained while he attacked Chatman, who held the shears up defensively.

ECF No. 64-2 at 3-5.

## II. Post-Trial Motion on Ineffective Assistance of Counsel

Following his conviction, but prior to sentencing, petitioner was appointed a new attorney who filed a supplemental motion for a new trial based on trial counsel's failure to investigate and present evidence of petitioner's mental health history to negate the intent required for the charged offenses.[5] See ECF No. 64-2 at Appendix 29-37. A post-trial hearing was held on September 26,

_____

[5] The court notes that the California Court of Appeal decision makes no reference to this hearing in the "Statement of Facts" section. Accordingly, there are no explicit state court factual findings that are entitled to a presumption of correctness. See 28 U.S.C. § 2254(e)(1). The Ninth Circuit has questioned whether AEDPA deference extends to implicit factual findings noting that "the

4

2005, in which Dr. Carlton Purviance, a licensed clinical psychologist who had performed a comprehensive psychological evaluation of petitioner, testified that he suffered from a psychotic disorder not otherwise specified, paranoid schizophrenia, alcohol-induced persisting dementia, alcohol abuse disorder, polysubstance abuse disorder, and antisocial personality disorder. ECF No. 78-5 at 22. This conclusion was reached by reviewing petitioner's prior psychiatric records and interviewing petitioner's family members. ECF No. 78-2 at 18-19 (listing all the records reviewed and interviews conducted as part of the psychological evaluation).

The relevant records dated back to 1990 and described petitioner as "so paranoid and suspicious that he could not attend to a comprehensive psychometric examination." ECF No. 78-2 at 19. This led to petitioner's involuntary commitment to the psychiatric ward at Contra Costa County Hospital. Id. at 20. He was treated for "questionable auditory hallucinations… [and] the possibility of visual hallucinosis." Id. In a 1996 evaluation, petitioner "appeared to be both delusional and psychotic" and "reported auditory hallucinations." Id. Formal psychometric testing was conducted and revealed that petitioner had "a subnormal intellectual function (IQ=69)." Id.

While in custody in 2004 for the offenses that are the subject of these proceedings, petitioner was evaluated by Dr. Minn based on reports that petitioner was experiencing auditory hallucinations and that he did not remember "going through a jury trial." ECF No. 78-2 at 19, 20. Petitioner indicated that he was "hearing demons and the devil" and that "[t]hey say I kill[ed] my cousin." Id. at 20. He was placed on anti-psychotic medications as a result, but they were discontinued in August 2004 at petitioner's request. Id.

Petitioner's family members who were interviewed by Dr. Purviance provided additional details of petitioner's mental health history. ECF No. 78-2 at 22. When he was around 19 years old, petitioner "cut off his hair, grabbed a Bible, and began wandering the streets claiming he was

state could always point to some 'implicit' finding by the state court to fill in a whole variety of constitutional defects." Goldyn v. Hayes, 444 F.3d 1062, 1065, n. 5 (9th Cir. 2006). Ultimately, the Court of Appeal left the issue an open question. Id. To the extent that AEDPA deference is due to any "implicit" factual findings by the California Court of Appeal, the undersigned concludes that petitioner has adequately rebutted such a presumption by clear and convincing evidence when the record is reviewed in its totality. See 28 U.S.C. § 2254(e)(1).

Jesus Christ." Id. This prompted his first psychiatric evaluation. Id. Petitioner's cousin, who was also his designated payee for Social Security disability payments, described the relationship between petitioner's long history of alcohol use and his mental state. Id. "[A]s time went on even small amounts of alcohol would have highly exaggerated effects on [petitioner.] Now alcohol makes him crazy…." Id.

At the post-trial hearing, Dr. Purvance testified that petitioner had used alcohol for such a long period of time that he sustained "brain damage and loss of cognitive function" as a result. ECF No. 78-5 at 24. When interviewed by Dr. Purvance in August 2005, petitioner once again reported experiencing auditory hallucinations. ECF No. 78-2 at 22. "I hear a bunch of conversations. It's most of the time because of the Bible. It's mostly God. It's because there are demons and devils around, and I know that." Id.

A respected criminal defense attorney, Dennis Healy, also testified at the post-trial hearing after having reviewed petitioner's psychological history, the police reports in the case, the preliminary hearing and trial transcripts, as well as trial counsel's file which consisted of about 26 or 27 pages of notes. ECF No. 78-5 at 45-47. Based on his review of the file, "[t]here's no discussion of any sort of background… or clinical history at all in terms of the witnesses" who were interviewed by trial counsel. ECF No. 78-5 at 50, 59. Mr. Healy explained that petitioner's psychiatric and psychological history could easily have been discovered by trial counsel "within 20 minutes and a couple of phone calls." ECF No. 78-5 at 48. If this information had been properly investigated, Mr. Healy opined that it would have supported a secondary defense based on lack of specific intent to establish attempted premeditated murder. ECF No. 78-5 at 49-50. This secondary defense strategy was not inconsistent with the self-defense strategy ultimately presented at trial which Mr. Healy conceded was also a viable and reasonable defense. ECF No. 78-5 at 61. Ultimately, the trial court denied petitioner's motion for a new trial and proceeded to sentencing. See ECF No. 78-5 at 89-91 (Transcript of September 30, 2005).

### III. Procedural History

### A. California Court of Appeal

With a fully developed factual record in hand, appellate counsel raised the ineffective

assistance of trial counsel claim on direct appeal before the California Court of Appeal.  See ECF No. 78-5 at 101-133 (Appellant's Opening Brief); see also People v. Lucas, 12 Cal.4th 415, 437 (1995) (stating that "[r]eviewing courts will reverse convictions (on direct appeal) on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for (his or her) act or omission.") (quoting People v. Zapien, 4 Cal.4th 929, 980 (1993)).  The state court denied relief on January 23, 2007 finding that trial counsel's performance was not deficient.  See ECF No. 64-2 at 3-8.

### B.   California Supreme Court

Petitioner's appellate counsel did not file a petition for review in the California Supreme Court resulting in the subsequent procedural default of petitioner's ineffective assistance of trial counsel claim in the current federal habeas proceedings.   Petitioner eventually did manage to file a pro se petition for review raising unknown claims for relief, but it was rejected by the California Supreme Court as untimely.  See ECF No. 78-5 at 242.

### C.   State Habeas Petition

By the time petitioner's current counsel was able to properly exhaust the ineffective assistance of trial counsel claim by filing a state habeas corpus petition it was deemed untimely by the California Supreme Court.  See ECF No. 78-5 at 242 (citing In re Robbins, 18 Cal.4th 770 (1998), and In re Clark, 5 Cal.4th 750 (1993)).

### D.   Federal Habeas Petition

The instant federal proceedings were initiated on January 21, 2010 based on petitioner's pro se filing of a habeas corpus petition pursuant to 28 U.S.C. § 2254.[6]  See ECF No. 1.  This petition alleged that petitioner's trial counsel was ineffective for pursuing a self-defense strategy at trial while not allowing petitioner to testify.  ECF No. 1 at 9.  Petitioner also contended that appellate counsel was ineffective for failing to raise this issue on direct appeal.  Id.  Respondent filed a motion to dismiss the petition arguing that it was barred by the one year statute of

---

[6] The petition was constructively filed on January 5, 2010 by applying the prison mailbox rule. See ECF No. 39 at 4; see also Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing the prison mailbox rule).

limitations.  ECF No. 12.

　　　While the motion to dismiss was pending, petitioner filed a motion seeking to: 1) delete his unexhausted IAC of appellate counsel claim; 2) stay his entirely exhausted federal habeas petition; and, 3) file an amended § 2254 petition once his IAC of appellate counsel claim was properly exhausted in state court.  ECF Nos. 21, 22.  Petitioner filed a proposed first amended § 2254 petition in which he alleged for the first time that his trial counsel was ineffective for failing to investigate and present his mental health history to negate the mental state required "for his crimes."  ECF No. 22 at 4 (Ground two hereinafter referred to as "the IAC claim").

　　　On January 12, 2011, the magistrate judge who was temporarily assigned to this case issued Findings and Recommendations that respondent's motion to dismiss be granted.  ECF No. 25.  The same magistrate judge denied the motion to amend subject to renewal.  See ECF No. 29. On April 4, 2011, the district judge declined to adopt the findings and recommendations and referred the case back to the magistrate judge for consideration of additional medical records that were submitted on the issue of equitably tolling the statute of limitations.  ECF No. 34.  On May 12, 2011, petitioner renewed his requests to amend his federal habeas petition and to stay proceedings pending state court exhaustion.  ECF No. 35.

　　　The undersigned was assigned the instant case on August 2, 2011 and recommended granting respondent's motion to dismiss on September 14, 2011.[7]  ECF Nos. 36, 39.  In these Findings and Recommendations, the undersigned concluded "that while petitioner suffered from mental health problems during the relevant period, he has not carried his burden under the first part of the Bills test to show that his mental illness was so severe that he was unable either to understand the need to file or to personally prepare and file a habeas petition."  ECF No. 39 at 5 (applying Bills v. Clark, 628 F.3d 1092 (9th Cir. 2010)).  The court addressed petitioner's low I.Q. separate and apart from his mental health issues and concluded that it did not justify equitably tolling the statute of limitations.  ECF No. 39 at 5-6 (applying Hughes v. Idaho State

---

[7] It was also recommended that petitioner's renewed motions to amend and to stay and abey the federal habeas proceedings be denied since the original habeas petition was deemed untimely filed.  See ECF No. 39 at 8.

8

Bd. of Corrections, 800 F.2d 905, 909 (9th Cir. 1986)). The undersigned viewed the evidence from the 2005 post-trial hearing as "bear[ing] only indirectly on his mental condition during the relevant [statute of limitations] period, which began on March 6, 2007." ECF No. 39 at 7 (applying Laws v. Lamarque, 351 F.3d 919, 932 (9th Cir. 2009). Ultimately, these recommendations were adopted by the district court judge on January 19, 2012, the case was closed and judgment was entered.[8] ECF No. 45.

### E. Ninth Circuit Appeal and Remand

Petitioner filed a timely notice of appeal of this court's judgment on February 10, 2012. ECF No. 47. The Ninth Circuit Court of Appeal reversed and remanded this case with instructions to allow petitioner to proceed with his habeas corpus petition despite its untimely filing in light of "his severe mental illness, combined with his mental retardation, [that] rendered him unable to timely file a petition." ECF No. 53 at 3-4. It reached this conclusion by reviewing the "long history of mental illness" in the record including petitioner's diagnosis of "psychotic disorder, paranoid schizophrenia, alcohol-induced persisting dementia, alcohol abuse disorder, and antisocial personality disorder." Id. at 2. The Ninth Circuit found that further proceedings concerning petitioner's diligence were also unnecessary in light of the undisputed underlying medical record in this case. Id. at 3-4. Petitioner "repeatedly attempted to secure the assistance of other inmates, and was able to file only after securing such assistance…." Id. at 4. The Ninth Circuit mandate issued on January 27, 2015. ECF No. 57.

### F. Post-Remand District Court Proceedings

This court appointed counsel to represent petitioner following the Ninth Circuit remand. ECF No. 62. On July 14, 2015, petitioner's counsel filed a motion to amend, a proposed second amended § 2254 petition, and a motion to stay proceedings pending the exhaustion of state court remedies. ECF Nos. 64-66. The second amended petition raised four claims for relief. ECF No.

---

[8] After conducting a de novo review of the case, the district court judge declined to adopt "those portions of the findings that rely on petitioner's own reporting of his mental status during the relevant time periods as support for the conclusion that petitioner's mental health was not so severe that petitioner was unable to understand the need to file or personally to prepare and file a habeas petition." ECF No. 45 (citing ECF No. 39 at 4: 19-21).

9

64-1 (Memorandum in Support of Second Amended 28 U.S.C. § 2254 petition).  The court's

present review is limited to petitioner's first claim for relief which is the IAC claim.  In this claim

for relief, petitioner asserts that his Sixth and Fourteenth Amendment rights were violated when

his trial counsel rendered ineffective assistance by failing to properly investigate and present

evidence of petitioner's mental health history and conditions to negate the intent element for

attempted first-degree murder.  ECF No. 64-1 at 14-19.

On October 15, 2015, the undersigned issued Findings and Recommendations that

petitioner's motions to amend and to stay federal proceedings pending state court exhaustion

should be granted.  ECF No. 69.  In reaching this conclusion, the undersigned extended the period

of equitable tolling granted by the Ninth Circuit to include the December 2010 first amended

§ 2254 petition which presented the IAC claim for the first time.  ECF No. 69 at 7-8.  "[T]he

Ninth Circuit's order of remand indicates that the panel found petitioner "unable personally to

prepare a habeas petition and effectuate its filing" largely due to factors that were not specific to

the period between November 2007 and January 2010, but were longstanding conditions: an

extensive history of mental illness, multiple psychological disorders, substance abuse issues, low

IQ, and poor language skills."  ECF No. 69 at 8.  These same factors were sufficient to find good

cause for a stay under Rhines v. Weber, 544 U.S. 269 (2005).  ECF No. 69 at 8-10.  The district

court adopted the Findings and Recommendations with respect to the motion to amend, but

denied the motion to stay as moot since the IAC claim had been exhausted in the interim.[9]  ECF

No. 72 at 2.

On October 5, 2016 respondent filed an answer to the operative second amended § 2254

petition.  Respondent contends that the IAC claim is procedurally defaulted based on the

California Supreme Court's determination that it was not timely presented to the state court.  See

ECF No. 78-5 at 242.  In the answer, respondent also argues that the IAC claim lacks merit

because the state court's finding that trial counsel's decision was tactical is presumed correct and

because trial counsel "could have reasonably decided not to investigate a mental health defense

---

[9] Although not currently at issue, the Batson and cumulative error claims raised in the second
amended § 2254 petition had also been exhausted in the California Supreme Court.

1  because it would have conflicted with petitioner's description of the incident and the self-defense

2  theory she presented at trial." ECF No. 77-1 at 25, 26.

3        Petitioner filed a traverse on February 3, 2017 asserting that the procedural default

4  doctrine does not bar relief in this case. Petitioner concedes that California's timeliness bar has

5  generally been found independent and adequate to bar federal review on the merits, but asserts

6  that there is adequate cause and prejudice to excuse the default in this case based on the

7  combination of petitioner's severe mental illness and intellectual disabilities. ECF No. 93 at 7-8

8  (Traverse). Petitioner requests relief even under the deferential AEDPA standard of review

9  because the California Court of Appeal's decision was objectively unreasonable in light of the

10  record evidence establishing that trial counsel "did not conduct an appropriate investigation to

11  explore other potential, more viable defense options" than self-defense. ECF No. 93 at 11-12.

12        In light of the allegations in petitioner's pro se filings and the lengthy litigation history in

13  this case, the undersigned ordered petitioner to supplement the record with an affidavit

14  addressing: 1) whether he had any access to legal assistance from January 24, 2007, the day after

15  the California Court of Appeal denied relief on his IAC of trial counsel claim, until March 5,

16  2007, the deadline for filing a petition for review in the California Supreme Court; and, 2)

17  whether petitioner received sufficient notice of the denial of his direct appeal by the California

18  Court of Appeal from his appellate counsel in order to timely file a pro se petition for review. See

19  Haines v. Kerner, 404 U.S. 519 (1972) (pro se pleadings should be liberally construed); see also

20  ECF No. 96 (Order of March 1, 2018); Cal. R. Court, Rule 8.366(b)(1); Cal. R. Court,

21  Rule8.500(e)(1).[10]

22        Petitioner filed the requested declaration indicating that he did not receive the letter from

23  his direct appeal counsel notifying him of the denial of his IAC of trial counsel claim until

24  "March 2007" even though it was dated February 23, 2007. ECF No. 98 at 2. This delay was

25  _____

26  [10] See also Murray v. Carrier, 477 U.S. 478, 487 (1986) (noting that "the rule applied by the [Fourth]Circuit Court of Appeals would significantly increase the costs associated with a

27  procedural default in many cases," and approving of the use of affidavits "or other simplifying procedures" by federal district courts in order to minimize the burdens to all parties).

28

attributed to petitioner's transfer from the California State Prison in Sacramento ("CSP-Sac") to Solano State Prison in Vacaville.  Id.  Remarkably, petitioner attached the 2007 letter from direct appeal counsel as well as a copy of the envelope it was sent in which indicates that it was received by the CSP-Sac mailroom on February 26, 2007.  ECF No. 98 at 5.  The envelope also contains a mailing label for the California Medical Facility in Vacaville ("CMF-Vacaville") and a notation of "CMF" that is scratched out.  ECF No. 98 at 5.  Petitioner indicates in his declaration that the letter was forwarded to CMF-Vacaville before finally reaching him at Solano State Prison.  ECF No. 98 at 2.  The envelope appears to support petitioner's assertion as it also contains a handwritten notation "Sol" in the addressee field.  ECF No. 98 at 5.  Based on this evidence, petitioner declared that he did not receive notice of the California Court of Appeal's decision in time to file a timely petition for review in the California Supreme Court.  ECF No. 98 at 2.  He further declared that he did not have access to any legal assistance during the time period from January 24, 2007 to March 5, 2007.  Id.

## IV.   Law of the Case

The Ninth Circuit Court of Appeals' remand order was clear.  Petitioner "produced uncontroverted evidence demonstrating a long history of mental illness, including a report by a psychiatric expert, Social Security Administration disability records, and prison medical records."  ECF No. 53 at 2.  No additional fact-finding by this court was necessary in order to conclude that equitable tolling was warranted.  Id. at 3-4 (finding that the record was also adequately developed to demonstrate that petitioner was diligent in pursuing his claims for relief).  These findings by the Ninth Circuit are now law of the case.  See Thomas v. Bible, 983 F.2d 152, 154 (9th Cir.) (reversing an award of attorneys' fees to defendants where a prior appeal decision, by implication, had concluded that plaintiff's action was not frivolous), cert. denied, 508 U.S. 951 (1993).

This court is precluded from reconsidering an issue that has already been decided by a higher court in the identical case.  See Milgard Tempering, Inc. v. Selas Corp. of America, 902 F.2d 703, 715 (9th Cir. 1990).  Here, law of the case doctrine applies because the severity and duration of petitioner's combined mental illness and intellectual disabilities were expressly before

12

the Ninth Circuit in determining the availability of equitable tolling.  See Milgard, 902 F.2d at 715 (quoting Liberty Mut. Ins. Co. v. E.E.O.C., 691 F.2d 438, 441 (9th Cir. 1982)).  Petitioner is now relying on this same combination of mental illness and intellectual disabilities to argue that the procedural default of his IAC of trial counsel claim should be excused.  See Schneider v. McDaniel, 674 F.3d 1144 (9th Cir. 2012).

## V.  Procedural Default

The procedural default doctrine is based on concerns of comity and federalism and is therefore not a jurisdictional bar to a federal court's consideration of the merits of a claim that was not reviewed by a state court due to an independent and adequate state law ground.  See Coleman, 501 U.S. 722, 730 (1991); Reed v. Ross, 468 U.S. 1, 9 (1984).  In light of petitioner's concession that California's timeliness bar is independent and adequate to bar federal review, this court will proceed to determine whether petitioner has demonstrated adequate cause and prejudice to excuse the default of his IAC claim.[11]  See Martin v. Walker, 562 U.S. 307 (2011); Bennett v.Mueller, 322 F.3d 573, 582-83 (9th Cir. 2003).  Generally, a federal court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates "cause" for the failure to properly exhaust the claim in state court as well as "prejudice" resulting from the alleged constitutional violation.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).

### A.  Cause

The general cause standard for excusing procedural default requires petitioner to show that "some objective factor external to the defense impeded counsel's efforts to construct or raise the claim."  McCleskey v. Zant, 499 U.S. 467, 493 (1991) (internal quotations omitted).  The cause standard will be met, for example, where the claim rests upon a new legal or factual basis that was unavailable at the time of direct appeal, or where "interference by officials" may have prevented the claim from being brought earlier.  Murray v. Carrier, 477 U.S. 478, 488 (1986).  A petitioner may also show cause by establishing constitutionally ineffective assistance of counsel,

---

[11] Petitioner does not raise the fundamental miscarriage of justice exception as an alternative basis to excuse petitioner's procedural default of his IAC claim.  See Schlup v. Delo, 513 U.S. 298 (1995).

but attorney error short of constitutionally ineffective assistance of counsel does not constitute cause and will not excuse a procedural default. McCleskey, 499 U.S. at 494.

### 1. Mental Condition[12]

In this case, petitioner is relying on an additional carve-out to the procedural default rule articulated by the Ninth Circuit Court of Appeal in Schneider v. McDaniel, 674 F.3d 1144 (9th Cir. 2012). See also Dickens v. Ryan, 740 F.3d 1302 (9th Cir. 2014) (en banc) (remanding for consideration of whether habeas petitioner can establish cause and prejudice to excuse the procedural default of an IAC at sentencing claim for failing to investigate and obtain evidence that petitioner suffered from organic brain damage and Fetal Alcohol Syndrome under Martinez v. Ryan, 132 S. Ct. 1309 (2012)); Holt v. Bowersox, 191 F.3d 970, 974 (8th Cir. 1999) (holding that a petitioner's mental illness may constitute cause to excuse procedural default where there is "a conclusive showing that mental illness interfered with a petitioner's ability to appreciate his or her position and make rational decisions regarding his or her case at the time during which he or she should have pursued post-conviction relief"). In Schneider, the Court of Appeal recognized that "Hughes [v. Idaho State Board of Corrections, 800 F.2d 905, 908 (9th Cir. 1986),] and Tacho [v. Martinez, 862 F.2d 1376 (9th Cir. 1988),] do not necessarily foreclose the possibility that a pro se petitioner might demonstrate cause in a situation where a mental condition rendered the petitioner completely unable to comply with a state's procedures and he had no assistance." Id. at 1154. Petitioner's March 16, 2018 declaration, in conjunction with the law of the case, leads the court to conclude that petitioner has met his burden of demonstrating that his mental illness and intellectual disabilities, in combination with one another, rendered him completely unable to comply with California's procedure for filing a petition for review within 40 days from the

---

[12] This court recognizes that the legal standard for equitable tolling based on a petitioner's mental illness is not the same as the standard for cause to excuse petitioner's procedural default. If it were, the court would have been able to bypass petitioner's procedural default without the necessity of supplementing the record with petitioner's affidavit. The bar is higher for excusing petitioner's procedural default due to state court comity concerns. See Schneider v. McDaniel, 674 F.3d 1144, 1154-55 (9th Cir. 2012) (discussing the rather "strange" result that petitioner's mental condition impeded his ability to timely file so as to warrant equitable tolling, but the same condition was not sufficient to excuse his procedural default).

California Court of Appeal's denial of relief.[13]  See ECF No. 1-1 at 2-3 (Petitioner's affidavit describing his mental health diagnoses and medication regimen during and after his state court direct appeal).  It is this unique combination of a documented IQ of 69, the language skills of a third-grader, a psychotic disorder, as well as paranoid schizophrenia, that allows petitioner to pass through the narrowest of exceptions to procedural default.[14]  See ECF No. 78-2 at 18-23 (Report of Dr. Carlton Purviance).  It simply cannot be said that this combination of conditions imposes less of a restriction on petitioner's ability to seek state court review than an inmate who is merely illiterate but retains the rest of his mental and verbal faculties.[15]  Compare Hughes, 800 F.2d at 908.  The record also demonstrates that petitioner did not have *any* access to legal assistance, jailhouse or otherwise, during this 40 day time period.  See ECF No. 98 at 2 (emphasis added).  Petitioner's lack of access to any legal assistance is due in part to his disordered mental state.  As petitioner colorfully described:  "I attempted to find someone to prepare a habeas petition for me, but because of my mental disorder and excursive mannerism from the effects of the anti-psychotic medication, I was considered an abomination and treated as an outcast."  ECF No. 19 at 22.  In light of all of this evidence, petitioner has established cause under Schneider to excuse the

---

[13] This court's analysis of cause to excuse the procedural default must look at the time period when the actual default occurred.  See Calderon v. Bean, 96 F.3d 1126, 1130 (9th Cir. 1996) (holding that the proper time for determining whether a procedural rule was firmly established and regularly followed is "the time of [the] purported procedural default"), cert. denied, 520 U.S. 1204 (1997); Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997) (discussing the proper date on which a state court's procedural rule is to be measured in determining its adequacy so as to bar subsequent review of the claim on the merits based on the procedural default doctrine and adopting the view that the correct "trigger date" is the time when the defaulted claims should have been raised). In this particular case, the procedural default of petitioner's IAC claim occurred when he failed to file a petition for review in the California Supreme Court.  That timeframe was extremely short, i.e. 40 days, and ran from January 24, 2007, the day after the California Court of Appeal denied relief on his ineffective assistance of trial counsel claim, until March 5, 2007, the deadline for filing a petition for review in the California Supreme Court.

[14] This court has previously found the same combination of circumstances sufficient to constitute "cause" to excuse petitioner's failure to exhaust claims one, three, and four of the second amended § 2254 petition.  See ECF Nos. 69 at 10 (Findings and Recommendation); 72 (Order adopting Findings and Recommendations).

[15] The description of petitioner's mental faculties by other inmates demonstrates this point.  "I became aware, after talking to Inmate Chatman, that he was not all there in his mind:  he would repeat the same words over, talk in a loud tone, dart his tongue in and out of his mouth, and laugh for no reason."  Declaration of Jamal Easterling, at 2.

procedural default of his IAC claim.

## 2. IAC of Appellate Counsel

As an additional basis for cause to excuse his procedural default, petitioner submitted evidence establishing that he did not receive notice of the California Court of Appeal's denial of his direct appeal in sufficient time to file a petition for review in the California Supreme Court. See ECF No. 98. "[A]ttorney's errors during an appeal on direct review may provide cause to excuse a procedural default; for if the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims." Martinez, 132 S. Ct. at 1317. While the parties' briefing in this matter focuses on whether direct appeal counsel was ineffective for failing to file a petition for review, the undersigned finds that the issue before the court is whether appellate counsel's failure to communicate the California Court of Appeal's denial to petitioner in a timely fashion constitutes ineffective assistance under Strickland.

The Sixth Amendment right to the "guiding hand of counsel" applies at trial proceedings as well as to a first appeal as of right. See Evitts v. Lucey, 469 U.S. 387, 396 (1985) (holding that due process requires the effective assistance of counsel during the first appeal as of right); Gideon v. Wainwright, 372 U.S. 335 (1963) (extending the right to counsel to indigent criminal defendants); Douglas v. California, 372 U.S. 353, 357 (1963) (extending the Sixth Amendment right to counsel to indigent criminal defendants on direct appeal); Powell v. Alabama, 287 U.S. 45, 69 (1932) (emphasizing the constitutional importance of defense counsel) . As the Ninth Circuit recognized, "[t]here is nothing in our jurisprudence to suggest that the Sixth Amendment right to effective counsel is weaker or less important for appellate counsel than for trial counsel." Ha Van Nguyen v. Curry, 736 F.3d 1287 (9th Cir. 2013). Here, appellate counsel had an ethical duty to communicate the California Court of Appeal decision to petitioner. See Cal. Rules of Professional Conduct, Rule 3-500 (stating that "[a] member shall keep a client reasonably informed about significant developments relating to the employment or representation, including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed."). The court incorporates this standard in

1    evaluating whether appellate counsel was ineffective in accordance with Strickland. See United

2    States v. Nickerson, 556 F.3d 1014 (9th Cir. 2009) ("readily acknowledge[ing] that a violation of

3    professional or ethical rules could lead to a deficient attorney performance that prejudices the

4    defendant, as contemplated by Strickland," but declining to adopt such a per se rule).

5         Petitioner's appellate counsel delayed sending notification of the direct appeal result since

6    the only correspondence from counsel in the record is dated a month after the decision of the

7    California Court of Appeal. ECF No. 98 at 4. Although appellate counsel's correspondence

8    indicates that this was the second copy of the opinion provided to petitioner, this is not supported

9    by any other evidence in the record and is directly contradicted by petitioner's declaration.

10   Compare ECF No. 98 at 4 with ECF No. 98 at 1-2. According to his affidavit, petitioner did not

11   receive any copy of the opinion from appellate counsel other than that dated February 23, 2007.

12   ECF No. 98 at 2. Ultimately, petitioner did not receive it until after the March 5, 2007 deadline

13   had passed. Id. Therefore, appellate counsel did not notify petitioner of the Court of Appeal

14   decision for a period of 30 days, absent any consideration of the additional time necessary for

15   petitioner to actually receive it through the United States Postal Service as well as the prison

16   mailroom. Id. at 4.

17        To constitute cause sufficient to excuse petitioner's procedural default, appellate counsel's

18   failure to notify petitioner must rise to the level of an independent violation of a defendant's

19   constitutional right to the assistance of counsel.[16] See Coleman, 501 U.S. at 753. In this case

20   appellate counsel's performance was deficient under prevailing professional norms because the

21   California Rules of Professional Conduct required "promptly" notifying petitioner of the

22   significant development in his case and providing him with a copy of the Court of Appeal

23   decision. See Strickland, 466 U.S. at 686; Cal. Rules of Professional Conduct, Rule 3-500. To

24   constitute prejudice, petitioner must demonstrate a reasonable probability of a different outcome

25   ───────────────
     [16] This court recognizes that there is a circuit split with respect to whether AEDPA deference or
26   de novo review is used in reviewing an ineffective assistance of counsel claim that may constitute
     cause to excuse a procedural default. See Visciotti v. Martel, 862 F.3d 749, 769 & N. 13 (9th Cir.
27   2016), petition for cert. filed (U.S. Dec. 1, 2017) (No. 17-6937). However, the law in this circuit
     is that AEDPA deference does not apply when reviewing the cause and prejudice necessary to
28   excuse a procedural default. Id.

absent counsel's error.  See Strickland, 466 U.S. at 693.  Had appellate counsel timely informed petitioner of the California Court of Appeal denial, petitioner may have been able to timely file a petition for review in the California Supreme Court and thus not have procedurally defaulted his IAC claim.  However, this court is not a soothsayer and cannot say with any degree of reasonable probability what the California Supreme Court would have done had it reviewed the IAC claim on the merits.  See Moormann v. Ryan, 628 F.3d 1102, 1106 (9th Cir. 2010) (explaining that Strickland's prejudice prong in the appellate context requires a petitioner to "demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal").  Accordingly, petitioner has not demonstrated prejudice under Strickland and is not entitled to have his procedural default excused based solely on the ineffectiveness of appellate counsel.

### 3.    Objective Factors External to Petitioner

Petitioner further asserts that his appellate counsel's delay, even if not rising to the level of ineffectiveness, constitutes "an objective external factor beyond Chatman's control that prevented him from filing a pro se petition for review" in the California Supreme Court.  ECF No. 93 at 10.  However, the delay in receiving the notification was also due in part to delays attributable to the CDCR mailroom.  ECF No. 98 at 5.  The mailing envelope provided by petitioner demonstrates that the letter traveled to three different prisons before it finally was delivered to petitioner sometime after March 5, 2007.  ECF No. 98 at 2, 5.  On this factual record, petitioner has demonstrated that the delay in delivering his legal mail by CDCR officials constituted interference preventing his IAC claim from being timely presented to the California Supreme Court.  Murray v. Carrier, 477 U.S. at 488.  The undersigned finds that the delay in petitioner's receipt of notice of the direct appeal denial was attributable to a combination of his direct appeal attorney's failure to timely communicate the result as well as CDCR's mailroom delay which were both factors beyond petitioner's control.  See ECF No. 98 at 4 (Letter from Christopher Blake dated February 23, 2007), 5 (Legal mail envelope from Christopher Blake, Esq. to Mr. Larry Chatman); see also Coleman, 501 U.S. at 753.  While this is an unusual circumstance, the Ninth Circuit Court of Appeal has emphasized that courts are not "limited to

18

considering only those actions that fit within previously recognized fact patterns as cause for a procedural default." Manning v. Foster, 224 F.3d 1129, 1134 (9th Cir. 2000). Accordingly, the court finds that petitioner has demonstrated cause sufficient to excuse his procedural default based on the combination of mail delays caused by his direct appeal attorney and the CDCR's mailroom.

### A. Prejudice

Since petitioner has succeeded in establishing two separate grounds for cause, the court now considers whether prejudice on the underlying IAC claim has been established which would not only allow the court to bypass procedural default, but would also allow the court to review the merits of this same IAC claim. Before conducting such prejudice analysis, however, the court first addresses the standard to be utilized in doing so. Petitioner asserts in his traverse that the more equitable cause and prejudice standard announced in Martinez v. Ryan, 566 U.S. 1 (2012), applies to this case. See ECF No. 93 at 9. In Martinez, the Supreme Court held that:

> "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim… where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial… [or] where appointed counsel in the initial-review collateral proceeding… was ineffective…. [A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."

566 U.S. at 14 (internal citations omitted). Respondent contests this assertion by pointing out that the IAC claim at issue here was in fact raised and rejected on direct appeal. See ECF No. 77-1 at 17. Furthermore, the Supreme Court explicitly explained in Martinez that the Coleman standard for cause and prejudice still applied to "petitions for discretionary review in a State's appellate courts." Martinez, 566 U.S. at 16. Since petitioner is arguing that his direct appeal attorney was ineffective for failing to raise the IAC claim in a petition for discretionary review in the California Supreme Court, the Martinez standard does not apply.

With that understanding, petitioner must demonstrate "not merely" that his trial counsel's ineffectiveness "created a possibility of prejudice, but that they worked to his *actual* and

substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original). For the reasons discussed more fully in Section X of this opinion, the undersigned finds that trial counsel's failure to investigate petitioner's mental health background meets this standard because it related to the intent necessary to commit the crime of attempted premeditated first-degree murder. *See* infra at XX.

## VI. Standards Governing Habeas Relief Under the AEDPA

To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that the state court decision resolving the claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or … resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

1  disagreement." Richter, 562 U.S. at 103.

2      The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

3  principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538

4  U.S. 63, 71-72 (2003). Clearly established federal law also includes "the legal principles and

5  standards flowing from precedent." Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

6  (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)). Only Supreme Court precedent

7  may constitute "clearly established Federal law," but circuit law has persuasive value regarding

8  what law is "clearly established" and what constitutes "unreasonable application" of that law.

9  Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

10  1057 (9th Cir. 2004).

11      Relief is also available under the AEDPA where the state court predicates its adjudication

12  of a claim on an unreasonable factual determination. 28 U.S.C. § 2254(d)(2). The statute

13  explicitly limits this inquiry to the evidence that was before the state court. See also Cullen v.

14  Pinholster, 563 U.S. 170 (2011). Under § 2254(d)(2), factual findings of a state court are

15  presumed to be correct subject only to a review of the record which demonstrates that the factual

16  finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

17  light of the evidence presented in the state court proceeding." It makes no sense to interpret

18  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

19  § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

20  same record could not abide by the state court factual determination. A petitioner must show

21  clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546

22  U.S. 333, 338 (2006).

23      To prevail in federal habeas proceedings, a petitioner must establish the applicability of

24  one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional

25  invalidity of his custody under pre-AEDPA standards. Frantz v. Hazey, 533 F.3d 724 (9th Cir.

26  2008) (en banc). There is no single prescribed order in which these two inquiries must be

27  conducted. Id. at 736-37. The AEDPA does not require a federal habeas court to adopt any one

28  methodology. Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

### VII.    Standards Governing Ineffective Assistance of Counsel Claim

The two prong <u>Strickland</u> standard governing ineffective assistance of counsel claims is well known and oft-cited.  <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  It requires petitioner to establish (1) that counsel's representation fell below an objective standard of reasonableness; and, (2) that counsel's deficient performance prejudiced the defense.  <u>Strickland</u>, 466 U.S. at 692, 694.  "The question is whether an attorney's representation amounted to deficient performance under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011) (citing <u>Strickland</u>, 466 U.S. at 690).  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u>, 466 U.S. at 693.  "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 189 (2011) (quoting <u>Richter</u>, 562 U.S. 86, 111-12 (2011)).

In reviewing a <u>Strickland</u> claim under the AEDPA, the federal court is "doubly deferential" in determining whether counsel's challenged conduct was deficient.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Richter</u>, 562 U.S. 86, 105 (2011).

### VIII.   State Court Decision

In applying the 28 U.S.C. § 2254(d) standard, this court reviews the last state court decision on the merits of the IAC claim, whether or not the state court explained its reason for denying the claim.  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 785 (2011); <u>see</u> <u>also</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991) (establishing the "look through" doctrine in federal habeas cases).  On February 27, 2017, the United States Supreme Court granted certiorari in <u>Wilson v. Sellers</u>, ___ U.S. ___, 137 S. Ct. 1203 (2017), to review the Eleventh Circuit's holding that <u>Harrington v. Richter</u>, 562 U.S. 86 (2011), abrogated <u>Ylst</u> and that federal courts may no longer "look through" a state court summary denial to review a prior opinion on the merits when conducting 28 U.S.C. § 2254(d) review.  However, in this case, the "look through" doctrine still

applies since the California Supreme Court's decision rejecting the IAC claim expressly rested on a procedural bar, and was not a summary denial like that in Harrington. In this case, even respondent acknowledges that the state court decision being reviewed under 28 U.S.C. § 2254(d) is the California Court of Appeal decision. See ECF No. 77-1 at 19 (stating that "the California Court of Appeal adjudicated this claim on the merits in a reasoned decision on direct appeal.").

In denying relief on direct appeal, the California Court of Appeal reasoned as follows:[17]

> Chatman contends that [trial counsel] performed deficiently because she 'never really explored the possibility of a mental defense.' Chatman cites nothing in this record to support his factual contentions that [trial counsel] did not investigate Chatman's mental history or consider presenting a mental defense. Instead, he offers this very wrong argument: '[trial counsel] never testified at the hearing below despite the fact that respondent could have called her as a witness; she never offered a declaration to show that she consulted with mental health experts or with appellant's family regarding his mental health … issues. From this can only come the conclusion that she did absolutely nothing
>
> Chatman, not [trial counsel], carries the burden of overcoming a presumption that [trial counsel] rendered adequate assistance. Therefore, absent affirmative evidence to the contrary, we presume that [trial counsel] did conduct an adequate investigation in connection with the preparation of Chatman's defense.
>
> Furthermore, [trial counsel] was not required to conduct an exhaustive investigation into Chatman's mental health history in order to render effective assistance. '[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In an ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" In re Andrews (2002) 28 Cal.4th 1234, 1254, quoting Strickland v. Washington (1984) 466 U.S. 668, 690-91, 80 L. Ed. 2d 674). Thus, to the extent [trial counsel] made a reasonable tactical decision to rely exclusively on self-defense, a decision not to investigate a mental defense would also have been reasonable.
>
> 'Reviewing courts defer to counsel's reasonable tactical

---

[17] The state court opinion refers to trial counsel by name. This court finds that information irrelevant in determining the reasonableness of the state court decision. Therefore, the court has substituted "trial counsel" for counsel's name throughout the California Court of Appeal opinion. The substitution appears in brackets.

decisions in examining a claim of ineffective assistance of counsel, and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' Defendant's burden is difficult to carry on direct appeal, as [our Supreme Court has] observed: 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her]act or omission.' (People v. Lucas, supra, 12 Cal. 4th at pp. 436-37.)

Here, the record before us does not affirmatively show that [trial counsel] had no rational tactical purpose for relying solely on a claim of self-defense. Rather, the circumstances support the conclusion that [trial counsel] made a reasonable tactical decision. Undeniably, there was evidence to support a self-defense theory. Indeed, Chatman's own expert conceded that defense was viable and reasonable. Had that defense persuaded the jury, Chatman would have been acquitted and would not have served any prison time.

Chatman's expert testified that he would have pursued a second line of defense, and used evidence of Chatman's mental health problems to argue for a lesser crime than attempted murder. But that expert did not testify that failing to present such a theory was objectively unreasonable. In our view, a defense attorney could reasonably have concluded that pursuing such a theory would offer the jury an alternative too tempting to resist and that the best chance of obtaining an acquittal was to focus exclusively on reasonable doubt evidence. Furthermore, presenting evidence of Chatman's mental health problems could have undermined efforts to portray Chatman as the real victim of the holiday altercation.

Another circumstance bearing on the reasonableness of a defense attorney's tactical decision is the wishes of the client. Here, as the trial court observed, Chatman rejected two plea offers prior to trial both of which would have resulted in a significantly lower sentence than he could have expected to receive if convicted of a lesser included offense to attempted murder. This circumstance reinforces that the decision to maximize the chances of an acquittal was a reasoned one.

Chatman has failed to carry his burden of proving that [trial counsel] performed deficiently by relying solely on a defense which was supported by the evidence and which, if accepted, would have resulted in acquittal. Therefore we reject the claim that Chatman was denied the effective assistance of counsel.

ECF No. 64-2 at 7-8. The state court opinion only addressed Strickland's deficient performance prong. It never reached the issue of whether petitioner could establish prejudice resulting from trial counsel's omission because it concluded that counsel's performance was not deficient. Id.

/////

24

### IX.    AEDPA Analysis

#### A.  28 U.S.C. § 2254(d)(2)

While the California Court of Appeal found the record silent with respect to whether trial counsel investigated petitioner's mental health history, this court has reviewed the underlying state court proceedings and believes that the record speaks volumes.  See ECF No. 64-2 at 7 (direct appeal opinion stating that petitioner "cites nothing in this record to support his factual contentions that [trial counsel] did not investigate Chatman's mental history or consider presenting a mental defense.").  Two specific examples from the post-trial hearing prove this point.  First, Mr. Healy reviewed trial counsel's file prior to testifying and found petitioner's clinical history completely absent from any of the 26 pages of file notes that trial counsel made. ECF No 78-5 at 50 (emphasizing that "99 percent of it is a recitation of different witness' views..." of the offense).  Additionally, and most importantly, there was no indication "[i]n all of the interviews of all of the witnesses" that trial counsel made "any inquiry whatsoever regarding petitioner's psychological history."  ECF No. 64-2 at Appendix 92.  Considering all of the witnesses in this case were related to petitioner and provided ample detail of petitioner's psychological history when asked by Dr. Purviance, the psychologist who testified at the post-trial hearing, there is no basis upon which to describe this record as silent.

The state court decision presumed that trial counsel conducted an adequate investigation notwithstanding evidence in the record to the contrary.  "[A]bsent affirmative evidence to the contrary, we presume that... [trial counsel] did conduct an adequate investigation in connection with the preparation of Chatman's defense."  ECF No. 64-2 at 7.  However, since trial counsel's decision concerning which defense to present at trial was not informed by *any* investigation of petitioner's mental health history, the state court unreasonably determined that it was a reasonable tactical decision.  28 U.S.C. § 2254(d)(2); see also Strickland, 466 U.S. 668, 690-91 (1984)(finding that a strategic tactical decision must be made *after* an investigation of the relevant facts) (emphasis added); Evans v. Lewis, 855 F.2d 631 (9th Cir. 1988) (finding deficient performance where counsel failed to review available documents); Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (finding deficient performance where counsel failed to investigate

25

mental state issues), cert. denied, 539 U.S. 958 (2003). As Mr. Healy explained to the trial court, "[y]ou can't know if it's reasonable if you didn't explore the other options, and… whether or not it was reasonable or not, I think, depends on whether or not it was more or less viable than the other possible defenses." ECF No. 78-5 at 52. Simply put, an omission by trial counsel cannot be labeled as a "reasonable tactical choice" under Strickland unless it was ruled out as a possible alternative after a sufficient investigation of the facts and the law. See Rios v. Rocha, 299 F.3d 796, 807, n. 18 (9th Cir. 2002) (emphasizing that "there is no possible justification for failing to at least conduct a preliminary investigation of both defenses before choosing one or both.").

In this case, the record of post-trial proceedings does not support the state court's conclusion that trial counsel's chosen defense at trial was a reasonable tactical decision. While "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect.'" Harrington, 562 U.S. at 109 (quoting Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (per curiam)), here the state court unreasonably relied on this presumption even when the record established a complete lack of investigation concerning petitioner's mental health history. The lack of a tactical basis for counsel's decision was detailed by Mr. Healy in the post-trial motion. "[I]t's only as tactical as the quality of the information in front of you….[T]hat's kind of the point in this case. I don't know if you can say a tactical decision was made… when you say that one of the options was not even considered because no one was aware of it." ECF No. 78-5 at 71. The court finds Mr. Healy's logic sound and supported by the evidence in this case.

The California Court of Appeal unreasonably determined the facts supporting its conclusion that trial counsel's decision was tactical in light of the evidence presented during the post-trial motion. This was the only basis for the California Court of Appeal's rejection of the IAC claim. It did not even reach the prejudice prong of Strickland because it concluded that trial counsel's performance was not deficient. Accordingly, petitioner has established that the state court's decision on the performance prong of Strickland was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, that by itself does not entitle petitioner to relief. See Frantz v. Hazey, 533

26

F.3d 724 (9th Cir. 2008). Petitioner's IAC claim is still subject to de novo review by this court. See Panetti v. Quarterman, 551 U.S. 930, 925 (2007) (when § 2254(d) is satisfied, the federal habeas court resolves the claim "without the deference AEDPA otherwise requires"); Frantz v. Hazey, 533 F.3d at 737 (when § 2254(d) (1) is satisfied, the federal habeas court conducts de novo review of constitutional claim).

### B. 28 U.S.C. § 2254(d)(1)

Additionally, this court finds that the California Court of Appeal unreasonably applied Strickland when it utilized petitioner's decision to reject two separate plea offers of a determinate sentence in its evaluation of the reasonableness of trial counsel's failure to investigate. See 28 U.S.C. § 2254(d)(1); ECF No. 64-2 at 8. The California Court of Appeal's reference to rejected plea offers was legally irrelevant in assessing whether counsel's performance was deficient. ECF No. 64-2 at 8. The state court explained that it was relying on these rejected plea offers as "another circumstance bearing on the reasonableness" of trial counsel's tactical decision of failing to investigate petitioner's mental health history. ECF No. 64-2 at 8. However, in so doing, it misapprehended the role of defense counsel and conflated the decisions that trial counsel was responsible for making with those of the defendant. In Strickland, the Supreme Court utilized the ABA Standards on Criminal Justice in explaining the Sixth Amendment standard for determining whether counsel's performance was deficient. 466 U.S. at 688-89. While the ABA Standards note that "counsel should give great weight to strongly held views of a competent client regarding decisions of all kinds," it does not leave the decision as to which defense to present at trial up to the client. See ABA Standards for Criminal Justice, Standard 4-5.2 "Control and Direction of the Case" (4th ed. 2015). More importantly, trial counsel's duty to investigate is not tied to a defendant's decision to plead guilty. The ABA Guidelines emphasize that "[d]efense counsel has a duty to investigate in all cases, and…[t]he duty to investigate is not terminated by… a client's expressed desire to plead guilty or that there should be no investigation, or statements to defense counsel supporting guilt." ABA Standards for Criminal Justice, Standard 4-4.1(a)-(b) (4th ed. 2015). More simply put, the client's wishes cannot abrogate defense counsel's duty under Strickland to conduct an adequate investigation. The state court's utilization of petitioner's

decision to reject two plea offers was an unreasonable application of <u>Strickland</u>.

"[T]he state court's ruling on the claim… was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011). The lack of a fairminded disagreement is evident from the absence of legal citations in the California Court of Appeal's analysis concerning petitioner's rejected plea offers. <u>See</u> ECF No. 64-2 at 8 (direct appeal opinion). Thus, the undersigned finds that petitioner also has met his burden under 28 U.S.C. § 2254(d)(1) entitling him to de novo review of the IAC claim.

## X.  De Novo Review of IAC Claim

Having already determined that the evidence in the record established that trial counsel failed to conduct any investigation into petitioner's mental health history, the undersigned concludes that defense counsel's performance was deficient under <u>Strickland</u> because that information was necessary to make an informed choice about which avenues of defense to pursue at trial. <u>See</u> <u>Strickland</u>, 466 U.S. at 690-91 (counsel's strategic decision only reasonable to the extent it is supported by reasonable investigation); <u>Riley v. Payne</u>, 352 F.3d 1313, 1318-19 (9th Cir. 2003) (failure to interview potential witness defeats argument that failure to present his testimony was reasonable strategic choice), <u>cert.</u> <u>denied</u> 543 U.S. 917 (2004). Such conduct was entirely unreasonable because petitioner was facing a life sentence and because petitioner's mental health history was easily accessible through the percipient witnesses to the crime who trial counsel interviewed or had a defense investigator interview. <u>See</u> ECF No. 78-4 at 281-292 (rebuttal testimony of defense investigator Anna Bandettini). All trial counsel had to do was simply start the conversation about petitioner's mental health condition, and these witnesses would have voluntarily provided a detailed and historical recitation of petitioner's severe mental illness, as demonstrated by Dr. Purviance's testimony at the post-trial hearing. In this case, the Sixth Amendment standard of competency is not an onerous one. It literally required only "20 minutes and a couple of phone calls." ECF No. 78-5 at 48.

Prejudice due to counsel's deficient performance is established in this case because the jury struggled with the issue of specific intent and premeditation as demonstrated by their first

question to the trial judge during deliberations.[18]  See ECF No. 78-4 at 357-358 (jury question and judge's response).  The jury asked whether "intent to kill require[s] knowledge that act would cause death?"  ECF No. 78-4 at 357.  The potential defense which trial counsel failed to investigate addressed the mental state required for attempted premeditated murder and would have provided the jury with a legal path to acquit petitioner of the life crime.  Petitioner was facing a potential life term if convicted of attempted premeditated murder, but was only facing a maximum determinate term of 22 years if convicted of the lesser-included offense of attempted voluntary manslaughter.  See ECF No. 78-5 at 67-69.  The test for prejudice is whether there is a reasonable probability of a different outcome which is defined as a probability sufficient to undermine the court's confidence in the verdict.  Strickland, 466 U.S. at 693.

When all of the post-trial mental health evidence is considered in light of the testimony at trial, the undersigned concludes that there is a reasonable likelihood that at least one juror, at a minimum, would have harbored a reasonable doubt about the premeditation element required to establish attempted first degree murder.  For the reasons, the undersigned finds that petitioner's mental health background would have raised a reasonable doubt for the jury about whether petitioner acted with premeditation and deliberation.  Accordingly, petitioner has demonstrated the reasonable probability of a different outcome at trial based on counsel's deficient performance in failing to investigate petitioner's mental health background to negate the intent required for attempted premeditated murder.

### XI.    Summary and Recommendation

This case, more than most, demonstrates the long and complicated path that a state

---

[18] The jury was instructed that:  If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is an attempt to commit willful, deliberate and premeditated murder…. To constitute willful, deliberate, and premeditated attempted murder, the would-be-slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being."  ECF No. 78-1 at 109-110.

prisoner must travel in order to obtain federal habeas relief under the AEDPA. While the United States Supreme Court has emphasized, time and time again, that the standard for obtaining relief is designed to be difficult, it is not insurmountable. See e.g., Harrington v. Richter, 562 U.S. 86, 786 (2011). Petitioner has demonstrated that he is entitled to relief even under the AEDPA's onerous standard.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's second amended application for a writ of habeas corpus be granted with respect to the IAC claim.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). However, the undersigned will not set a briefing schedule for objections at this time. Instead, the court has scheduled a settlement conference in this matter by separate order filed concurrently herewith.

IT IS FURTHER ORDERED that the objection period is stayed pending further order of the court.

Dated: April 2, 2018

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

12/Chat0264.f&r.docx